UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS E. MUNSON,<br><br>Plaintiff,<br><br>v.<br><br>SPLICE COMMUNICATIONS, INC., et al.,<br><br>Defendants. | Case No.  12-cv-05089-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 33 |

## I.     INTRODUCTION

Plaintiff in this diversity action is a former employee of Defendant Splice Communications, Inc. ("Splice").  He asserts state law claims based on promises and representations allegedly made by Splice to induce him to accept a position at Splice.  He also alleges that he was terminated for engaging in activity that is protected under the California Fair Employment and Housing Act ("FEHA"), namely, refusing to carry out Defendants' instructions to fire a Splice employee based on his race.  Defendants bring a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("the Motion") in which they seek summary judgment as to all of Plaintiff's claims.  A hearing on the Motion was held on Friday, November 22, 2013 at 9:30 a.m. The parties filed supplemental materials in response to the Court's questions on December 4, 2013.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[1]

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.  Facts[2]

Dennis Munson was employed by Splice as Vice President of Sales from March 24, 2011 until he was terminated, on October 4, 2011.  Joint Statement of Undisputed Facts ("JSUF"), No. 1 (citing Complaint ¶¶ 14, 36; Declaration of Mark S. Askanas in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Askanas Decl."), Ex. A (Munson Depo.) at 37:11-14).   Splice began negotiating with Munson after attempting unsuccessfully to recruit another candidate for the position, Dennis Sherwood.  Declaration of Scott Bischoff in Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Bischoff Decl."), ¶¶ 3-5.  Splice initially engaged in negotiations with Munson through a recruiter, Joe Jeffrey.  *Id.* ¶ 6.  In addition, Scott Bischoff, Splice's Chief Operating Officer and Chief Financial Officer, engaged in direct negotiations with Munson regarding his potential employment with Splice.  *Id.*

On February 18, 2011, Jeffrey sent an email to Bischoff providing a brief description of Munson and asking if Bischoff had any interest in Munson.  Bischoff Decl., Ex. B.  The email stated that Munson "want[ed] to relo to the bay."  *Id.*  Subsequently, Munson and Bischoff exchanged a series of emails and engaged in discussions, *see id.* ¶ 8 & Ex. B, ultimately culminating in an offer letter outlining the terms of Munson's employment with Splice.  *Id.*, Ex. C.  Because many of the issues before the Court turn on the terms of Munson's agreement with Splice – both written and oral – the Court provides here a lengthy excerpt of the offer letter, which stated, in part, as follows:

> Dear Dennis:
>
> On behalf of Splice Communications, Inc., I am pleased to extend to you an invitation to join our corporate team.  Should you choose to accept our offer, you will be responsible for the overall coordination, the functional management and leadership of the sales activities of the business.  The official title for this position is Vice President of Sales and will report to the Chief Operating Officer.
>
> The following letter will outline the terms of your employment.

---

[2] The facts stated in this section are undisputed unless otherwise noted by the Court.

United States District Court
Northern District of California

. . .

<u>Job Responsibilities</u>:
- Responsible for delivering the required new business revenue and account retention per month in order to meet the company financial objectives
- Responsible for the recruitment, training/development, supervising and evaluation of all department staff
- Directs all field and in house sales functions of the company.  The position is specifically responsible for field sales, inside sales (if applicable) and indirect channel sales
- Directs the monthly and annual sales objectives for all of the sales personnel
- Develops and executes sales selling cycle and methodology, activity requirements and documentation in salesforce.com and other company required tools.
- Evaluates and analyzes the effectiveness of the team, its individual members and develops/recommends new product and service opportunities that will contribute to sales growth.  Will work with all appropriate departments for the proper evaluation and rollout to the company, its customers and new prospects
- In coordination with the COO, Marketing and other applicable departments, will establish compensation plans, sales contests and customer/marketing promotions.
- Meet with each member of the sales team on a weekly basis and hold one team meeting per week, in order to develop the skill sets of each member.   Identify areas of needed improvement (Sales, Activity requirements etc) and document progressive improvement programs.
- Attend customer/prospect meetings in the field with all team embers in order to evaluate the sales skills, product/company value proposition  knowledge and overall qualification of opportunities
- Continued development and education of market/industry trends, competitors and leading customer acquisition strategies.

**Compensation**

1. **Base Salary**: $125,000 per year
2. **Variable Compensation**:  You will be eligible to receive additional variable compensation based on the performance related metrics as follows:

- **Booked Sales Bonus**: Based on the 100% Target of 30,000 in new business sold per month, You will be eligible to receive a percentage of the total new business sold, based on the achieved sales percentage of the target:

|      |          |     |
|------|----------|-----|
| I.   | 60-69%:  | 5%  |
| II.  | 70-75%:  | 7%  |
| III. | 76-99%:  | 12% |
| IV.  | 100-109%:| 17% |
| V.   | 110-119%:| 20% |
| VI.  | 120-129%:| 25% |
| VII. | 130%+:   | 30% |

** Bonus is determined by measuring the total sales for the quarter in comparison to the combined target for the quarter (30,000 x 3 months).

Bonus is paid in the first pay period following the end of the quarter.

- **Term Bonus:** 3/4% of the total contract value will be paid on all new contracts sold by the sales team which have contract lenths of 24 months or greater,  Bonus is based on the first invoice for each circuit contract.  This bonus is available during the 6 month ramp period
- **Revenue Retention Bonus:** A 1% of total contract value bonus will be paid on all existing on term or off term circuits/contracts which are successfully extended ("Re-termed").  The total contract value is based on the net new contract revenue and is calculated by multiplying the number of months by the new monthly price to the customer.  All term lengths extended are eligible for this bonus.  This bonus is available during the 6 month ramp period.
- **Additional Variable Compensation**:  As Splice incorporates new products/services to our existing portfolio, there will be opportunities for additional compensation programs.  Specifics will be determined as the products and services are rolled out to the sales team.

3. <u>**Ramp Compensation**</u>:  You will be eligible to receive a monthly "ramp" compensation for the first 6 months of employment while you are building the team, based on the completion of assigned Measured Business Objectives ["MBOs"].  For Months 1-3 the monthly payment will be $9,000 and months 4-6 the payment will be $6,000 per month.  Payments for each measured month will be made in the 1st week of the following month via manual check, with all necessary withholdings.  Measured Business Objectives required as follows:

- <u>**Month 1**</u>: Hire 1 sales person.  Sales plan developed (To include activity requirements, Retention Plan, identify product "sweet spots" and target verticals, Salesforce.com evaluation and recommendations (if any) Funnel/Activity tools Implemented)
- <u>**Month 2**</u>: Hire additional 2 Heads, 1 Sales Engineer, Sales Training Program in place.  Evaluate current team members (Document/terminate as needed)
- <u>**Month 3**</u>: Hire 1 Head, Develop Product/Service Reference Docs for Sales Team, Comp Plan Revisions (if Any) finalized
- <u>**Month 4**</u>: Hire 1 Head, Identify New Products for focus (Wholesale or White Label); Cloud, Colo/Hosting etc), work with Pricing and Marketing to develop plan and timeline for rollout
- <u>**Month 6**</u>: Sales at 50% of Target ($15,000)
- <u>**Month 7**</u>: Sales at 75% of Target ($22,500)

*** A "true-Up" bonus will be paid for the dollar difference between 100% payout bonus and the ramp up bonus listed above for moths 1-6, if sales for months 7-12 average 100% or greater of target.  The purpose is to reward Dennis for building a quality team and driving the desired results after the ramp up period.  The payment of the true up bonus will be in the beginning of month 13, if sales results appear to be well above the 100%, or at the total revenue target for months 7-12 in advance of month 12, Splice may

pay this bonus in advance as well.

You are also encouraged to drive individual sales opportunities to contribute to your team number and benefit from the performance bonus achieved.  If you individually sell individual opportunities, which exhibit the "quality" elements (term lengths, term extensions etc), you would be eligible to receive the full term bonus payout for those opportunities (the rep component and the manager component).  This would exclude the 50% MMR payout, usually paid for the reps, as the dollar value of the sale contribute and pay toward your team quota objective and bonus payout.  Any individual sales bonuses would be paid on invoiced, but the dollar value of the sale contributing to his team number would be based on the booked date of the sale, to which the bonus would be paid in the first month following the end of the previous quarter.  It is important to note that the performance of the team should be the top priority and individual contribution would be best realized after the team is in place and performing at the required levels, thus allowing additional time to uncover other opportunities on an individual basis.

. . .

5. **Equity**:   You will be eligible to participate in the Splice Communications Employee Incentive Stock Option Plan.  This plan will be detailed in separate plan which will be provided to you within 30 days of hire date.  The vesting schedule of the shares is 25% per year. If you join the company you will be issued 10,000 shares.  If upon performance review, you have performed at an average of 100% or above of target for months 7-12, an additional 5,000 shares will be awarded to you.

6. **Discretionary Bonuses**:  The company may, at its discretion, award discretionary bonuses in any amount based on performance and other factors.
. . .

14. **Relocation Expense**:  Within one week of the start date, Splice will issue a relocation expense stipend in the amount of $10,000 to assist in any required relocation expenses.  Any direct expenses, to which Dennis can provide receipts for tax purposes, would be appreciated, but he has the option to use this stipend at his discretion.

15. **Temporary Lodging**:  Splice will reimburse hotel lodgings for up to two weeks in order to allow time to arrange for permanent housing.
. . .

**Terms of Employment**
Splice Communications is an "at will" employer.  Your employment may be terminated at any time by you or Splice Communications Inc., with or without cause.

**Modification to terms outlined above**
Any and all modifications to the terms of employment related to compensation, benefits, PTO etc, must be made in writing by the Chief Operating Officers of Splice Communications.

5

1   Munson signed the offer letter on March 14, 2011. *Id.*

2       Notwithstanding the detailed terms set forth in the offer letter, signed by Bischoff and

3   Munson, the parties' characterizations of their expectations as to Munson's employment with

4   Splice vary widely on a number of issues, including: 1) whether Munson would move to

5   California and/or reside there permanently;  2) Splice's commitment to hiring a sales engineer; and

6   3) when the stock options referenced in the offer letter would vest, and 4) the amount of Munson's

7   overall compensation.

8       With respect to Munson's relocation to California, Munson states in his declaration that

9   "[p]rior to accepting an offer of employment from Splice, I negotiated and received assurances

10  and agreement from Scott Bischoff and Andy Coan on behalf of Splice that I would be

11  able to perform my job from my home in Michigan after a period of time setting up and training

12  my sales team at Splice headquarters."  Declaration Of Dennis Munson Submitted In Opposition

13  To MSJ [Rule 56] ("Munson Decl."), ¶ 5.  Munson further states:

14          At the time I considered employment with Splice, I was a single father who
            shared joint custody of school-aged children. I did not intend to and I would
15          not have agreed to take position on the West Coast of the U.S. that would
            require me to relocate my residence to California on a permanent basis. It
16          was always my intention, and I made it clear to every employer I
            interviewed with including Splice, that I would reside in Michigan and
17          remain close to my children, while working remotely from my employer's
            sales office.
18

19  *Id.* ¶ 4.  He states further that during his negotiations with Bischoff, they discussed the fact that

20  Bischoff and three other executives regularly worked remotely from Splice headquarters and that

21  "[w]ithout having received the promise that [he] could return home after a reasonable period of

22  time setting up and running the sales team, [he] would not have accepted the offer of employment

23  from Splice."  *Id.* ¶ 6.  According to Munson, it was based on this agreement that he took out a 6-

24  month lease on the apartment he rented in San Mateo.  *Id.*

25      In contrast, Bischoff states in his declaration that "prior to extending an offer to Plaintiff,

26  Plaintiff and I discussed Plaintiff's relocation from Michigan to California and specifically

27  negotiated Plaintiff's relocation stipend to assist Plaintiff's move to California."  *Id.* ¶ 8. Further, in

28  his deposition, Bischoff denied that he or Andy Coan had ever discussed with Munson the

United States District Court
Northern District of California

6

possibility of Munson working remotely from Michigan.  Askanas Decl., Ex. B (Bischoff Depo.) at 106-107.  Instead, Bischoff testified that he told Munson during the interview process that "the position was a Bay Area-based position."  *Id*. at 107.  According to Bischoff, "[i]t was always the goal to have that position be based in the San Mateo office."  *Id*.  Splice also provides copies of emails between Munson and Bischoff discussing the terms of Munson's employment, including an inquiry from Munson about his "relocation package."  Bischoff Decl., Ex. B at 2.   Bischoff initially offered $6,000 for relocation, but stated that Splice could be "flexible."  *Id*.  Munson responded that "[m]oving everything to CA would cost [him] 10-15 k min."  *Id*. at 1.  He further stated, "I will probably be better off [illegible] selling everything and starting fresh from there." *Id*. It is undisputed that Splice ultimately paid Munson $15,000 in relocation expenses.  JSUF ¶¶ 8-9.

The parties' expectations regarding the hiring of a sales engineer also appear to have differed significantly.   Munson states in his declaration that in his initial research about Splice, he learned that Splice did not have a sales engineer, which he found "highly unusual" for a telecommunications company that sold voice and data services.  Munson Decl., ¶ 7.  According to Munson,

> [a] sales engineer is critical to success in the   telecommunications sales process. A sales engineer working with a sales team assists sales representatives in answering technical questions about a prospective client's ability to merge existing telecommunications infrastructure with, and make use of, the telecommunications systems offered for sale by companies such as Splice.

*Id*., ¶ 8.  Munson further states that "the level of technical support and detailed information that national-scale customers required about integrating systems and networks, hardware and software that is required is beyond the knowledge of even the most experience [sic] sales representative and the sales engineer establishes the credibility needed to close business."  *Id*., ¶ 9.  Consequently, Munson states, "[on]e of the first matters that [he] brought up with Scott Bischoff during [his] initial telephone interview with him about the VP of Sales position was the absence of a Sales Engineer at the company."  *Id*., ¶ 11.  According to Munson, he made clear to Bischoff and Coan that hiring a sales engineer was a condition of his accepting employment at Splice and Munson

1   received "verbal promises from Scott Bischoff and Andy Coan that [he] would be permitted to

2   hire a sales engineer." *Id.*, ¶ 12.  Munson states, in particular, that Bischoff promised he could

3   "quickly hire a sales engineer: first was during an in-person meeting on or around March 3, 2011

4   at Splice's office, and then during a phone conversation on or around March 14, 2011, three days

5   after [he] received, but before [he] signed, [his] offer-of-employment letter . . . ."  *Id.*, ¶ 13.

6   Munson also states that "[p]rior to being hired, [he] negotiated for and received a promise that [he]

7   would have control of [his] sales team and that [he] would be able to hire a sales engineer to assist

8   [his] team." *Id.*, ¶ 24.

9        According to Munson, after he arrived at Splice he worked with professional recruiters to

10  find a sales engineer, reviewing around 100 resumes, conducting 50 interviews and passing

11  approximately 25 candidates on to Bischoff.  *Id.*, ¶ 16.  Munson states that Bischoff rejected all of

12  the candidates he proposed but that after he "[stood] his ground with Mr. Bischoff and Mr. Coan at

13  [his] 6 month review" he was allowed to bring back the last candidate for another interview;  that

14  candidate, according to Munson, was hired but did not begin working for Splice until after

15  Munson's termination.  *Id.*, ¶ 17; *see also* JSUF ¶ 13.  According to Munson, "not having a sales

16  engineer on staff was having a detrimental effect on [his] sales team and [he was] aware of having

17  lost a number of sales owing to [the team's] inability to provide timely and accurate technical

18  information that our competitors were able to furnish to customers. . . ."  *Id.*, ¶ 19.

19       Splice does not offer testimony by Bischoff (or any other Splice employee) addressing any

20  commitments that may or may not have been made to Munson by Splice regarding the hiring of a

21  sales engineer.  Instead, it contends the offer letter does not contain an affirmative promise to hire

22  a sales engineer in Month 2 (even though it was a Month 2 Measured Business Objective).  Reply

23  at 7.  Further, it asserts that Munson fails to offer evidence of any verbal commitment to hire a

24  sales engineer in the second month of his employment to the extent he only states in his

25  declaration that a sales engineer would be hired "quickly."  *Id.*  Splice also points to the

26  undisputed facts that Munson received the ramp bonus for Month 2, even though a sales engineer

27  was not hired, and that Splice ultimately hired a sales engineer.  *Id.* at 8.  According to Splice,

28  Munson conceded that he was not harmed by Splice's failure to hire a sales engineer because he

United States District Court
Northern District of California

8

1  was paid the Month 2 bonus.  *Id.* at 8 (citing Supplemental Declaration of Mark S. Askanas in

2  Support of Defendants' Motion for Summary Judgment, or, in the Alternative, Partial Summary

3  Judgment ("Supp. Askanas Decl."), Ex. A (Munson Depo.) at 127-128.[3]

4         The parties also have divergent views as to the nature of Splice's commitment to provide

5  stock options to Munson.  According to Bischoff, the offer letter made clear that the stock options

6  would not vest until Munson had worked at Splice at least one year.  Bischoff Decl., ¶ 15 ("Under

7  Plaintiff's offer letter, Plaintiff was entitled to Splice stock if he worked at least one year.  The

8  vesting of Plaintiff's shares would be 25% per year following his completion of one year of

9  employment.  Plaintiff's stock options were accounted for in Splice's Employee Stock Ownership

10  Plan ("ESOP") worksheet. . . Because Plaintiff did not work for at least one year, his stock options

11  never vested and thus Plaintiff was not entitled to any shares upon his termination.")  In contrast,

12  Munson apparently believed that his stock options would vest immediately.  Munson Decl., ¶ 15

13  ("During the employment interview with Splice, I received promises from Scott Bischoff that if I

14  accepted the job, I would be given ten thousand shares of Splice stock.  This term is also in my

15  employment letter.  I accepted the job offer from Splice.  I did not receive the promised ten

16  thousand shares of Splice stock.").  Neither Plaintiff nor Defendants offer testimony or evidence

17  about any specific communications between the parties about when the Splice stock options would

18  vest.  Rather, the only evidence in the record on this question is the "Equity" term in the offer

19  letter.

20         Finally, Munson states in his declaration that "Scott Bischoff also told [him he] could

21  expect to earn between $300,000 and $400,000" in his position at Splice.  Munson Decl., ¶ 15.  In

22  his interrogatory responses, Munson further states that "Splice promised a compensation plan of

23  $300-$400k and didn't deliver.  Askanas Decl., Ex. C (Plaintiff's Response to Defendant's Special

24  Interrogatories, Set One) at 17.  Munson does not, however, offer any specific evidence that

25  Bischoff affirmatively misrepresented the terms of his compensation package as set forth in the

26

27  ─────────────────
    [3] In his deposition, Munson testified that he was not penalized by Splice for failing to hire a sales
28  engineer in Month 2 to the extent he was paid the ramp bonus for that month.  Supp. Askanas
    Decl., Ex. A (Munson Depo.) at 127-128.

offer letter.  Further, it is undisputed that the base salary provided for under the offer letter was $125,000, with the remaining compensation to depend on whether Munson met the Measured Business Objectives set forth in the offer letter.  JSUF ¶¶ 7-8.

Munson began working at Splice on March 24, 2011.  JSUF ¶ 1.  According to his September 15, 2011 performance review by Bischoff (covering the period April 1, 2011 through August 31, 2011), Munson "immediately began interviewing and hiring members of his team." Bischoff Decl., Ex. E1 at SC 0034.  "By the end of April he had three new Sales Directors in position (Richard Robinson, James Peterson and Marlone Tablante)."  *Id*.  Further, as of the date of the evaluation there were "six reps in position."  *Id*.   Bischoff noted in his evaluation that the goal had been to have a full team by month six but that Munson was "ahead of schedule," having hired the full team by month four.  *Id*.

Nonetheless, with respect to actual sales, Bischoff found that there was a "significant shortfall, which requires immediate attention and corrective action."  *Id*., Ex. E2 at SC 0037.  In particular, the evaluation states that the combined sales quota for the team was $50,000.00 but that actual sales were only $21,018.50, falling short of the quota by 58%.  *Id*., Ex. E1 at SC 0036-37. The evaluation stated that the need for corrective action was particularly pressing for Richard Robinson and James Peterson, whose actual sales were off by 85% and 77% respectively.  *Id*. at SC 0037.  The evaluation further stated that only one sales representative on the team, Samantha Ide, was above her quota, by 2 %.  *Id*.  Team member Marlone Tablante was 31% below his quota. *Id*.

The evaluation also identified a number of areas that Bischoff believed required improvement, including the number of sales calls that were being made by team members (characterized as "extremely disappointing"), *id*. at SC 0038, "the team's failure in following the required marketing process for following up and documenting the company's marketing leads," *id*. at 0039,  and "resistance by the team to cold calling new prospects."  *Id*.  In addition, the evaluation states that "[n]ow that [Munson] is entering his 5th month with the company, it is necessary that he ramp up his use and full understanding of salesforce.com [which is] not only the required Sales/CRM for Splice, but it has become the industry standard . . . By October 15, I

would like for Dennis to incorporate the salesforce reports into his team and Individual meetings and begin to migrate away from multiple spreadsheets to capture sales data." *Id*., Ex. E3 at SC 0045. The evaluation acknowledged that hiring a sales engineer had been a "real challenge for the company in terms of finding the right candidate for this position." *Id*. at SC 0045. It went on to state that there had been "some disagreement with Dennis over the qualifications needed, which we appreciate . . .[but that] [w]e agree with Dennis' strategy of finding the sales people, who may not have the MPLS background, and leveraging the expertise of an SE to assist." *Id*. at SC 0046.

The Summary at the end of the evaluation states as follows:

Dennis has made a significant Investment by corning to Splice. He took a leap of faith and moved out of state, away from his family in order to have the opportunity to build a world class organization and have an impact. Both Andy and I have great respect and appreciation for the sacrifice he has made. We also share in the desire to build a world class sales organization and company.

It is based on these goals, that I thought it important to do this assessment, in order to clearly communicate to Dennis both his strengths and improvement opportunities. This assessment is by no means punitive, but there are areas that do need to be addressed with his team quickly so his success, the team's success and the company's success can be assured. This is a growth opportunity for Dennis. With all growth opportunities, there is a requirement of honest self evaluation and a willingness to learn and change based on the results, conditions and environment of his position and responsibilities. Everyone in the company is tasked with this same challenge. We are all in growth positions as the company will continue to grow and change.

Dennis has made some impressive first steps in sales and contract revenue growth and retention. He appears to have the loyalty and cooperation of his team and garnered respect for his accomplishments thus far with his peers in the company.

We are now entering the next phase where the growth and development will require a steep and timely increase. With the possibility of an acquisition and addition to product set, company profile and volume of employees, it is imperative for me as Dennis' manager, to know that he has the detailed management and knowledge of "his business" firmly under control. In order to do that, I am convinced that his direct and consistent attention to the recommendations and areas of focus listed above is required.

I personally am committed to Dennis' success and feel strongly that if he does not succeed, it would be inexcusable for me, if I did not take every opportunity, and provide the feedback, resources and tools necessary to assist him. I am convinced that Dennis can be extremely successful and can realize amazing growth in professional experience responsibility, skill set and of course financial reward. The next three years will be monumental for

> Splice and we view Dennis as having the great opportunity to be a significant contributor to the Splice story, which we hope he and his family view as a great return on the Investment he has made by joining the company.

*Id.*, Ex. E3 at SC 0046-0047.  The evaluation was signed by Munson and Bischoff on September 15, 2011.

Two and a half weeks later, on October 4, 2011, Munson was terminated.  JSUF ¶ 1.  According to Bischoff, Munson was terminated "[w]hen it became clear [Munson] was failing and did not warrant further investment."  Bischoff Decl., ¶ 14.  Munson, however, offers a very different account of the events leading up to his termination.  In his declaration, he states that he was terminated as the result of his refusal to carry out Bischoff's repeated requests that he terminate Richard Robinson, the only African American member of his sales team.  Munson Decl., ¶¶ 33-39.  According to Munson, these requests culminated in a meeting between Bischoff and Munson in  mid-September in which Munson told Bischoff he could see "no reason to select Robinson for termination unless it was the color of his skin, as his performance was excellent and he was developing his sales business as expected and required . . . ."  *Id.*, ¶ 36.  Munson states that in response, "Bischoff replied . . . in anger that California was an at-will employment state and that he . . . 'can get rid of anyone he wants to for any reason he wants.'"  *Id.* [4]

That same day, according to Munson, he went to the human resources manager for Splice, Scott Orvis, and reported the discussion with Bischoff, expressing concern that Bischoff was asking Munson to break the law by firing Robinson.  *Id.*, ¶ 37.  About a week later, Munson states, he met with CEO Andy Coan and expressed his belief that "Mr. Bischoff had perhaps illegally selected Robinson for termination based on his race."  *Id.*, ¶ 38.  Munson further states that he told Coan that Robinson was "one of [his] best performers and was nearly indispensible to [his]

---

[4] In his deposition, Bischoff testified that his "last one-on-one conversation" with Munson was on September 21 and it marked the point when he decided that he didn't think he could develop Munson into the role of VP of sales.  *See* Declaration of Edwin Bradley Submitted in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Bradley Decl."), Ex. 1 (Bischoff Depo.) at 66-68.  Bischoff further testified that he did not tell Munson that he was not meeting Bischoff's expectations  but rather, told Munson that their positions were "not in alignment . . . in terms of [Munson's and Bischoff's] philosoph[ies] on how to manage the team."  *Id.* at 67.  Bischoff also testified that on September 23 or 24 he had a conversation with a previous applicant for VP of sales who was now available and Bischoff "started considering that this other person was the correct person for the job."  *Id.* at 68.

United States District Court
Northern District of California

1    team for the assistance he provided as an experienced sales rep." *Id*.  According to Munson,

2    shortly after this meeting Coan and Bischoff left town for several days and Mr. Bischoff did not

3    return to the office for "approximately one week." *Id*., ¶ 39.  Munson states that the first time he

4    saw Bischoff after his return Bischoff informed Munson that he had been terminated.  *Id*.  Munson

5    also states that as he packed up his office to leave Splice, the HR Manager, Mr. Orvis, told

6    Munson that he agreed with Munson that Robinson had been terminated because he refused to fire

7    Richard Robinson.  Munson Decl., ¶ 41.

8         It is undisputed that Robinson resigned after Munson's termination, on January 10, 2012.

9    Bischoff Decl., ¶ 16 & Ex. I (Robinson resignation letter).   Although Robinson stated in his letter

10   of resignation that he was leaving Splice to "pursue other opportunities," *see id*., he states in a

11   declaration offered in support of Plaintiff's opposition that he was asked to resign.  Declaration of

12   Richard Robinson Submitted in Support of Plaintiff's Opposition to Defendants' Motion for

13   Summary Judgment ("Robinson Decl."), ¶¶ 17-20.  Robinson describes the circumstances of his

14   resignation as follows:

15        17.  In January 2012 Mr. Coan approached me and requested that I resign
          from Splice. Prior to Mr. Coan making this request, I had not been informed
16        by any of my managers that my job was in jeopardy, other than by Mr.
          Munson when he informed me of Mr. Bischoff's earlier requests that I be
17        terminated . . . . When he asked me to resign, Mr. Coan stated to me that
          Splice "was not the right fit" for me, or similar words to that effect.
18
          18.  At the time Mr. Coan approached me, my sales funnel was maturing to
19        the point that I expected to close sales of Splice products at or above my
          quota. In my experience in telecommunications sales, developing a sales
20        funnel for sales of the size and complexity of those that we worked on at
          Splice, takes approximately six to nine months to fully develop. Based on
21        my knowledge and experience in the industry, this time-frame is widely
          understood and accepted. By the time Mr. Coan requested my resignation, I
22        had been working for the Splice sales team for approximately nine months.

23        19.  I responded to Mr. Coan's request that I resign by explaining that my
          sales funnel was reaching maturity and that I expected to achieve my sales
24        quota within 30 to 90 days. I assured Mr. Coan that by then I would achieve
          my sales quota, which was the only criticism of me that I was aware of, and
25        which was also true for most if not all of my colleagues. I requested that
          Splice place me on a plan that would re-evaluate its request for my
26        resignation at the end of . . . sixty days to permit me to make the quota that
          I was on the verge of accomplishing.

27        20.  Mr. Coan responded to me by saying that even if I made my sales
28        numbers, I would not succeed at Splice, or words to that effect.  Based on

                                      13

> Mr. Coan's assurance that regardless of my sales quota I would not be able to keep my job, I accepted Splice's request that I resign, Splice would pay me three weeks' salary, among other matters. Based on my discussion with Mr. Coan, I believed that if I did not accept this offer my employment at Splice Communications, Inc. would [be] terminated without severance. I did not choose voluntarily to resign my position at Splice and would not have resigned but for Mr. Coan's information.

Robinson Decl., ¶¶ 17-20.

In his declaration, Robinson also described what he perceived to be hostile treatment by Bischoff that did not appear to be work-related. *Id.*, ¶¶ 6-7. Robinson states that Bischoff "routinely and regularly and consistently and openly expressed hostility and disdain towards [him] that [he] did not observe him do with other, non-African-American employees." *Id.*, ¶ 9. In addition, according to Robinson, during the summer of 2011 he discovered that he was being skipped over in the distribution of sales leads, which was done on a rotation system. *Id.*, ¶ 10. Robinson states, "[b]eing skipped in the sales lead rotation had a direct and negative effect on my sales performance. Being skipped denied me equal access to sales opportunities as they arose and were supposed to be distributed in successive order by the lead generation system then in place at Splice." *Id.*

Munson also states in his declaration that Robinson was removed from the rotation by Bischoff. Munson Decl., ¶ 27. According to Munson, Bischoff ostensibly removed Robinson from the rotation due to poor sales figures (some of which were incorrect due to the fact that the reporting program, saleforce.com, was not properly configured) but did not subject other, non-African-American members of the team to the same treatment, even though their sales also fell short. *Id.*, ¶ 26. Munson also states that "[b]ased on Bischoff's response to Robinson's job interview, and his selection of only Richard Robinson for removal from sales lead rotation, it began to appear to [him] that Bischoff treated Robinson differently in a negative way, than he did the other employees at Splice," none of whom were African-American. *Id.*, ¶ 29. At his deposition, Munson conceded that he never heard any Splice employee "explicitly" make a derogatory comment about Robinson based on race; rather, he testified that his opinion that Bischoff wanted him to terminate Robinson due to his race was based on "feeling and speculation." Askanas Decl., Ex. A (Munson Depo.) at 165, 170. Munson also testified that

14

1   although Robinson knew he was being singled out based on race, he did not recall whether

2   Robinson ever stated as much.  *Id.* at 182.

3       **B.  The Complaint**

4       Munson filed the complaint in this action on October 2, 2012.  He alleges that federal

5   jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332 because he is a citizen of

6   Michigan and all defendants are residents of California and the amount in controversy exceeds

7   $75,000.00.   Complaint, ¶¶ 2-5.  In the complaint, he asserts the following claims:

8       1) <u>Claim One</u>:  Unlawful Retaliation in Violation of the Fair Employment and Housing

9   Act ("FEHA") (against Splice) based on allegations that Munson "engaged in protected activity

10  when he resisted Defendant's direction that Plaintiff terminate the employment of a qualified

11  African American employee"  and that "Defendant was motivated to terminate Plaintiff's

12  employment in substantial part as a result of Plaintiff's refusal to comply with Defendant's

13  unlawful demand to terminate Richard Robinson."  *Id.* at 11.

14      2) <u>Claim Two</u>:  Breach of Agreement (against Splice) based on allegations that "Plaintiff

15  and Defendant agreed to certain express and implied terms of employment" and that "Defendant

16  failed to honor its promises and agreements with Plaintiff."  *Id.* at 12.[5]

17      3) <u>Claim Three</u>: Breach of Implied Covenant of Good Faith and Fair Dealing (against

18  Splice) based on allegation  that "[c]ontained within the employment agreement negotiated and

19  entered into between Plaintiff and Defendant Splice were certain terms that are implied by

20

21  _____

    [5] In his interrogatory responses, Plaintiff identified the following factual bases for his Breach of
22  Agreement Claim:  1)  Defendants agreed that Plaintiff could "work remotely from Michigan part
    time for the first 6-12 months as [Munson] built the Splice Sales team and then to begin working
23  part time in California once the team was built" but "Bischoff stated that one reason for
    termination was because [Munson] was working too much from home."  2) Munson's
24  compensation was "never at the level stated in pre-hire emails of $300k-$400k." 3) "Defendant
    Bischoff at no time permitted [Munson]  to run the inside sales team that generated leads for
25  [Munson's] outside sales team." 4) "[Munson] never received any shares of stock within the first
    30 days as promised in his offer letter of employment." 5) [Munson] was not permitted to recruit
26  his staff as stated and promised in his offer letter of employment with respect to the Sales
    Engineer applicants.  After [Munson] began working at Splice, Defendant Bischoff stated that the
27  Sales Engineer position would need to be approved by him and others before [Munson] would be
    permitted to offer the SE position to anyone.  [Munson] believes that Defendants unreasonably
28  and in bad faith withheld approval of numerous otherwise qualified Sales Engineer applicants."
    Askanas Decl., Ex. C at 12-13.

United States District Court
Northern District of California

operation of law" including an implied covenant of good faith and fair dealing, and that

Defendants breached the implied covenant of good faith and fair dealing by "refusing to perform

the agreement, by failing to act in good faith, [and] by using its unique powers and discretion in

the employment relationship." *Id*. at 13.[6]

       4) <u>Claim Four</u>:  Violation of California Labor Code § 970 (against Splice) based on

allegations that "[i]n reliance on Defendant's . . . representations . . . Plaintiff  changed his place

of residence from the state of Michigan to San Mateo County, California for the purpose of

accepting Defendant's offer of employment as VP of Sales for Splice Communications" and that

Defendant's conduct constituted "intentional misrepresentations about the nature, pay and

conditions of the employment Defendant offered  . . . ." *Id*. at 14.

       5) <u>Claim Five</u>:  Fraud and Deceit (against Splice, Coan and Bischoff) based on the

allegation that Defendants misrepresented the "nature of Plaintiff's duties, his compensation, his

responsibilities, his ability to hire a sales engineer, his receipt of stock options, his ability to work

remotely as agreed, and Defendants' intent to employ Plaintiff in the position of VP of Sales were

false and intended to conceal [from] Plaintiff the true facts regarding Defendants' intentions." *id*.

at 15.  Plaintiff further alleges that "[a]mong other things. . . Defendants intended . . .to obtain

Plaintiff's services only until such time as they were able to hire other persons to fill the VP of

Sales position." *Id*. at 16.

      6)  <u>Claim Six</u>:  negligent misrepresentation (against Splice, Coan and Bischoff) based on

allegation that Defendants breached a duty of care owed to Plaintiff in making the representations

described above. *Id*. at 17.

      7)  <u>Claim Seven</u>:  promissory estoppel (against Splice) based on allegations that Splice

---

[6] In his interrogatory responses, Plaintiff identified the following factual bases for his breach of
implied covenant of good faith and fair dealing Claim:  1) "Splice terminated [Munson] without
good cause and in violation of Plaintiff's agreement and after failing to perform the employment
agreement . . . ."; 2) "Defendants falsely claimed that [Munson's] inadequate job performance was
the reason for termination"; 3) Defendants did not pay [Munson] as promised and did not permit
[Munson] to manage his own sales team or to hire a critical member of his sales team as agreed:  a
sales engineer"; 4) Defendants sent mixed signals about [Munson] working remotely, contrary to
their agreement at hire . . .[and] cited working remotely as one of the reasons for termination";
5)[Munson] contends that his refusal to terminate Robinson was a substantial motivating factor in
defendants' decision to terminate him."  Askanas Decl., Ex. C at 14.

United States District Court
Northern District of California

1   promised an employment opportunity to Munson with certain terms and conditions, that it did not

2   fulfill its promises and that therefore it is "legally estopped from depriving Plaintiff of the

3   expected benefits of the agreement." *Id*. at 17-18.[7]

4       Munson seeks general and special damages on all of his claims.  He also seeks punitive

5   damages on Claims One, Five and Six.

6       **C.  The Motion**

7       Defendants contend they are entitled to summary judgment as to all of Plaintiff's claims.

8   Motion at 2.  With respect to Munson's Claim One, for retaliation under FEHA, Defendants argue

9   the claim fails for several reasons.  *Id*. at 7-8.  First, Defendants assert Munson cannot show that

10  he engaged in protected activity, which requires evidence that Munson opposed his employer's

11  conduct that he "reasonably and in good faith" believed was discriminatory.  *Id*. at 7 (citing

12  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1043 (2005)).  In support of this assertion,

13  Defendants contend Munson "admits that there is absolutely no evidence that Robinson was

14  discriminated against and that the basis for his belief is based entirely on his 'feelings and

15  speculation.'" *Id*. (citing Munson Depo. at 165).  Defendants also point to Munson's deposition

16  testimony that he never heard any Splice employee make any explicitly derogatory comment

17  based on race and that he did not recall Robinson stating that he had been discriminated upon

18  based on race.  *Id*. (citing Munson Depo.) at 170, 182.  Defendants further assert that Munson

19  cannot establish that he engaged in protected activity because Robinson was not terminated during

20  Munson's employment and Robinson ultimately resigned from Splice.  *Id*. at 8.

21      Defendants also contend they are entitled to summary judgment on Munson's retaliation

22  claim because there is "no nexus between Plaintiff's alleged complaint and his termination."  *Id*.

23  In particular, Defendants assert that there is "absolutely no evidence that Plaintiff was terminated

24  in connection with his refusal to terminate Robinson," citing the undisputed fact that Munson's

25  _____

26  [7] In his interrogatory responses, Plaintiff identified the following factual bases for his promissory
    estoppel claim:  1)  "Splice promised a compensation plan of $300-$400k and didn't deliver." 2)

27  "Splice promised the ability to work remotely and did not deliver." 3) Splice promised the
    Respondent could hire a Sales Engineer and did not deliver." 4) Splice promised that Respondent
    would be permitted to manage the inside sales team, and did not deliver." 5) "[Splice] promised

28  10,000 shares of company stock and did not deliver."  Askanas Decl., Ex. C at 17.

United States District Court
Northern District of California

sales team missed its sales quota, *id*. (citing JSUF ¶ 12), and Munson's deposition testimony that his sales team "was not at the level they needed to be at." *Id*. (citing Munson Depo. at 140). Further, Defendants contend, Splice had a legitimate, non-discriminatory reason for terminating Munson, namely his "poor performance." *Id*. at 8.

Defendants assert that they are also entitled to summary judgment on Claim Two, for Breach of Agreement. *Id*. at 8-15.

First, Defendants contend Munson's breach of agreement claim fails because it is undisputed that he was an at-will employee. *Id*. at 9-10.

Second, Defendants assert the claim fails because the offer letter did not require that Splice permit Munson to hire a sales engineer in his second month of employment, even though one of the Measured Business Objectives for the second month was to hire a sales engineer. *Id*. at 10. Defendants further contend that Munson's contention that Splice actively prevented him from hiring a sales engineer is "absurd." *Id*. at 10-11. Even if the offer letter required that Splice allow plaintiff to hire a sales engineer in the second month, according to Defendants, the claim fails because Splice paid Munson the bonus for that month even though no sales engineer was hired; therefore Munson suffered no damages, according to Defendants. *Id*. at 11. Defendants also point out that on September 21, 2011, prior to Plaintiff's termination, a sales engineer was, in fact, hired. *Id*.

Third, Defendants assert there was no breach of agreement because there was no promise to allow Munson to work remotely in the offer letter. *Id*. at 11-12. Defendants also assert that the evidence shows that the parties understood Munson was expected to relocate to California. *Id*. at 12 (citing email from Joe Jeffrey stating that Munson wanted to relocate, Bischoff Decl. ¶ 8 & Ex. B, and deposition testimony of Bischoff that it was Splice's expectation that Munson would relocate, Askanas Decl., Ex. B at 107-108, 113-114).

Fourth, Defendants assert that under the terms of the offer letter, Splice did not promise that Munson would receive Splice shares within 30 days of the commencement of his employment. *Id*. at 12-13. Rather, Defendants contend the equity provision of the offer letter made clear the shares would not vest until Munson had been employed with Splice for a year. *Id*.

18

In addition, Defendants argue that they did, in fact, issue the stocks, pointing out that Munson's stocks, though not vested, were accounted for in Splice's Employee Stock Ownership Plan worksheet. *Id.* at 13 (citing Bischoff Decl., ¶ 15 and Ex. H).

Fifth, Defendants reject Munson's contention that they breached their agreement with him because his compensation was never at the level promised in his pre-employment emails of $300,000 to $400,000. *Id.* According to Defendants, none of these communications *guaranteed* that Munson would receive a salary at this level; instead, they only stated that the salary could potentially be this high under Splice's incentive compensation plan. *Id.* To the extent Munson believed these statements were a commitment to pay him $300,000 to $400,000 a year, Defendants assert, there was no meeting of the minds and therefore no enforceable obligation. *Id.* at 13-14. Even if Bischoff did make such a promise in his emails, Defendants contend, the offer did not promise this level of compensation and therefore Defendants did not breach their agreement with Plaintiff. *Id.* at 14.

Sixth, Defendants argue that Munson's breach of agreement claim fails to the extent it is based on an alleged promise to allow him run the inside sales team because the offer letter only made him responsible for inside sales "*if applicable.*" *Id.* Further, Defendants assert, even if the offer letter gave Munson responsibility for inside sales, Splice was entitled to change the terms of his employment because Munson was an at-will employee. *Id.*

Seventh, Defendants argue the breach of agreement claim fails to the extent it is based on the allegation that Splice did not permit Munson to hire a sales engineer. *Id.* at 15. According to Defendants, nothing in the offer letter gave Munson *exclusive* power to hire a sales engineer or prohibited other Splice executives from interviewing and evaluating candidates. *Id.* Further, Defendants argue that the claim fails because "Splice actively recruited and interviewed numerous candidates" and ultimately hired a sales engineer on September 21, 2011. *Id.*

Defendants argue next that they are entitled to summary judgment on Claim Three, for breach of the implied covenant of good faith and fair dealing for the same reasons they contend the breach of agreement claim fails. *Id.* at 15-18. In particular, Defendants assert the claim fails because: 1) Munson was an at-will employee; 2) Splice was not required to allow Munson to run

1   the inside sales team; and 3) Splice was not required to allow Munson to work remotely from

2   Michigan.

3           Defendants also seek summary judgment on Claims Four, Five and Six, for violation of

4   California Labor Code § 970, fraud and deceit and negligent misrepresentation. *Id*. at 18-19.

5   According to Defendants, these claims fail because there is "no evidence that Defendants made

6   any false representations about Splice's Vice President of Sales position to Plaintiff. *Id*. at 18.

7   Similarly, as to Plaintiff's promissory estoppel claim, Claim Seven, Defendants contend they did

8   not make any clear promise to Munson that was breached and therefore, that this claim also fails

9   on summary judgment. *Id*. at 19.

10          Finally, Defendants contend the "undisputed facts preclude a finding by clear and

11  convincing evidence that Defendants acted with malice, oppression or conscious disregard against

12  Plaintiff" and therefore, the court should grant summary judgment as to Plaintiff's claim for

13  punitive damages on Claims One, Five and Six. *Id*. at 21. In support of this position, Defendants

14  state that "[a]t all times, Splice acted consistent with its obligations under Plaintiff's offer letter"

15  and that "the uncontroverted evidence establishes Plaintiff was terminated due to poor

16  performance." *Id*.

17          In his Opposition, Munson argues that Defendants are not entitled to summary judgment

18  because they have not demonstrated that there are no material disputes of fact as to any of

19  Plaintiff's claims.  Opposition at 1.  As to the retaliation claim, Claim One, Plaintiff argues that

20  there is evidence sufficient to create a material dispute of fact that he engaged in protected activity

21  because he both opposed discrimination and assisted Robinson in exercising his right to be free

22  from racial discrimination. *Id*. at 6.  Munson points to evidence that Robinson was his most

23  experienced sales representative, Robinson's "sales numbers were at or near the top of the team,"

24  and Robinson was the only African American employee at Splice.  Munson also cites evidence

25  that he expressed concern to Splice's HR manager, to Bischoff and to Coan that the demands that

26  Robinson be terminated were based on race, that he was terminated within two weeks of raising

27  his concerns about Robinson's termination with Coan, there were no intervening events between

28  Munson's complaints and his termination, and Robinson was later asked to resign and told he

1   would be fired, regardless of his sales numbers, if he did not resign.  *Id*. at 7.  Munson also rejects

2   Defendants' assertion that he cannot demonstrate a causal connection between his protected

3   activity and his termination, arguing that the short period of time between his protests about

4   efforts to terminate Robinson and his termination is sufficient to raise an inference of causation.

5   *Id*. at 9 (citing *Passantino v. Johnson & Johnson Consumer Products*, *Inc*., 212 F.3d 493, 507 (9th

6   Cir. 2000)).

7        Munson also asserts that Splice has failed to demonstrate that there was a legitimate, non-

8   discriminatory reason for terminating him based on "poor performance" or that "the procedure by

9   which Plaintiff was terminated was 'validly and fairly devised and administered to serve a

10  legitimate business purpose.'"  *Id*. at 9-10 (quoting *Hanson v. Lucky Stores, Inc*., 74 Cal. App. 4th

11  215, 224 (1999)).  Further, Munson argues there is evidence sufficient to create a jury question

12  that the reason for terminating Munson offered by Splice was pretext.  *Id*. at 10-11.   In particular,

13  Plaintiff points to his evaluation of September 15, in which Bischoff stated that he was "convinced

14  that Dennis can be extremely successful."  *Id*. at 10.   According to Plaintiff, the evidence that

15  Bischoff decided six days later, at the point when Munson objected to efforts to terminate

16  Robinson, that Munson was no longer the right person for the job, is sufficient to create a jury

17  question as to the motivation for firing Munson.  *Id*. at 10-11.

18       Munson argues that his breach of contract claim also survives summary judgment.  *Id*. at

19  11-15.  First, he argues that Defendants have failed to cite any authority that because he was an at-

20  will employee he cannot assert a breach of contract claim based on promises made about the

21  conditions of his employment with Splice.  *Id*. at 12.  According to Munson, his contract claims do

22  not depend on whether he was an at-will employee and his breach of agreement claim is not based

23  on his termination.  *Id*.  Further, he asserts, he has presented evidence to show that Splice made

24  *verbal* promises to him that go beyond the scope of the offer letter and that to the extent these

25  promises are not inconsistent with the offer letter these promises may be the basis for a breach of

26  contract claim.   *Id*. at 13 (citing *Scott v. Pacific Gas & Electric*, 11 Cal. 4th 454, 463 (1995)). In

27  particular, Munson cites evidence that: 1) he received verbal assurances that he could hire a sales

28  engineer within the first two months of his employment at Splice; 2) he was told he would be

21

1    permitted to work remotely; 3)  he was told he would be issued 10,000 shares of Splice stock

2    simply for joining Splice;  4) he was promised his compensation would be in the range of

3    $300,000 to $400,00 and 5) he was told he would have complete control of the company's inside

4    sales team.  *Id*. at 13-15.

5        Similarly, Munson rejects Defendants' challenge to Claim Three, for Breach of Implied

6    Covenant of Good Faith and Fair Dealing, arguing that Defendants fail to address the many verbal

7    promises made to Plaintiff that go beyond the obligations expressly stated in the offer letter.  *Id*. at

8    15-16.  According to Plaintiff, there is a triable issue of fact as to Splice's interference with his

9    right to obtain the benefit of his contract based on: 1) Splice's failure to allow Munson to hire a

10   sales engineer in his first two months of employment; and 2) by "depriving plaintiff of his

11   managerial responsibilities."  *Id*. at 16.

12       With respect to Claims Four, Five and Six, Plaintiff points out that Defendants have only

13   challenged one element of these claims:  whether Defendants have made misrepresentations.  *Id*. at

14   17.   For the reasons his contract claims survive summary judgment, Munson contends, there is

15   also sufficient evidence to demonstrate fact questions as to whether Splice made

16   misrepresentations that support his claims under California Labor Code § 970, for fraud and deceit

17   and for negligent misrepresentation.  *Id*.  Further, Munson asserts, under *Riverisland Cold*

18   *Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1182 (2013), "the fraud

19   exception to the parol evidence rule now permits the admission of evidence of misrepresentations

20   that contradict the written terms of the contract" and therefore "Defendants should not be able to

21   reply on the parol evidence rule as a shield to prevent proof of fraud."  *Id*. (quotation omitted).

22       Munson argues that Defendants also are not entitled to summary judgment on his

23   promissory estoppel claim, Claim Seven, because they have misstated the test, which requires only

24   that a plaintiff demonstrate that the defendant's promises were "definite enough such that a court

25   can determine the scope of the duty, and the limits of performance must be sufficiently defined to

26   provide a rational basis for the assessment of damages."  *Id*.  According to Munson, Defendants

27   "have made no effort . . . to show why this test cannot be met."  *Id*.  Further, Plaintiff rejects

28   Defendants' contention that they accounted for Plaintiff's 10,000 shares of stock and therefore did

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1  not breach their promise as to the equity Plaintiff was promised for accepting Splice's

2  employment offer.  *Id*.  Munson argues, "Defendants have not shown that Splice did anything

3  further than make accounting entries; no argument or evidence is presented suggesting that Splice

4  delivered the stock it promised, or that Splice was excused from doing so."  *Id*.

5          Finally, Munson rejects Defendants' assertion that he cannot establish that he is entitled to

6  punitive damages, arguing that Defendants fail to identify any evidence that supports the

7  propositions that Splice acted consistent with its obligations under the offer letter and terminated

8  Munson for poor performance.  *Id*. at 18-19.  Further, Munson argues that his request for punitive

9  damages is based on Defendants' pre-hire conduct, which Defendants have not addressed.  *Id*. at

10  19.

11          In their Reply brief, Defendants reiterate the arguments in their Motion.  In addition, they

12  object to certain statements in the declarations of Dennis Munson and Richard Robinson.[8]

13          At the hearing, the Court asked the parties to address: 1) whether the evidence regarding

14  control of the inside sales team is sufficient to create a fact question as to the breach of agreement

15  claim; 2) the meaning of "change from one place to another" under Cal. Labor Code § 970; and 3)

16  whether a claim for promissory estoppel can be maintained if there is a written contract between

17  the parties.  The parties filed supplemental briefs on these questions after the hearing.

18          In his supplemental brief, Plaintiff concedes that his promissory estoppel claim is

19  precluded because there is an express written contract between the parties.  Plaintiff's

20  Supplemental Brief in Response to Defendants' Motion for Summary Judgment ("Plaintiff's Supp.

21  Brief") at 3.  Accordingly, the Court GRANTS summary judgment on the promissory estoppel

22  claim (Claim Seven).  As to the Cal. Labor Code § 970 claim, Plaintiff argues that even a

23  temporary change of residence is sufficient to satisfy that section under *Collins v. Rocha*, 7 Cal. 3d

24  232 (1972).  *Id*. at 2-5.  Plaintiff contends Judge Hamilton's decision in *Asnaashari v. PNY*

25  *Technologies, Inc*., 2013 WL 2403605 (N.D. Cal. May 31, 2013), in which the court found that the

26  plaintiff could not bring a claim under § 970 because he had not moved to California, is

27

28  _____

[8] Defendants' objections are overruled unless otherwise stated below.

United States District Court
Northern District of California

1    distinguishable.  *Id*. at 4-5.  There, according to Plaintiff, the plaintiff did not even establish a

2    temporary residence in California, instead making only "site visits" one week out of each month.

3    Similarly, Plaintiff asserts, *Stevens v. Thomas Keller Restaurant Group*, 2009 WL 38418709

4    (N.D. Cal. Nov. 17, 2009), is distinguishable because the plaintiff who was seeking to assert a §

5    970 claim had made preparations to move but had not actually relocated when the employment

6    offer was rescinded.  *Id*. at 5. Finally, Plaintiff contends the evidence is sufficient to show that

7    there is a fact question with respect to whether he was promised he would have control over the

8    inside sales team at Splice.  *Id*. at 6-9.

9           Defendants assert in their supplemental brief that Plaintiff's Cal. Labor Code § 970 claim

10   fails because while a *temporary* change of residence falls within the ambit of this provision, there

11   was not any relocation whatsoever in this case.  Defendants' Supplemental Brief in Support of

12   Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Defendants'

13   Supp. Brief") at 4.  In particular, Defendants point to the undisputed facts that Plaintiff "never (1)

14   sold his home in Michigan; (2) bought a home in California; (3) changed his residence to

15   California; or (4) obtained a California driver's license."  *Id*. at 5.  As to the evidence relating to

16   the inside sales team breach of agreement claim, Defendants contend the provision in the offer

17   letter giving Plaintiff control of the inside sales team "if applicable" does not show that Plaintiff

18   was promised he could control the inside sales team.  *Id*. at 5-6.  Even if such a promise had been

19   made, Defendants contend, there was no breach because Plaintiff admitted in his deposition that he

20   was told in his first week at Splice that he would not be in charge of the inside sales team.  *Id*. at 6

21   (citing Supplemental Declaration of Mark S. Askanas in Support of Defendants' Motion for

22   Summary Judgment, or, in the Alternative, Partial Summary Judgment [Docket No. 40] ("Second

23   Supp. Askanas Decl."), Ex. A (Munson Depo.) at 147-148).  According to Defendants, because

24   Munson continued to work at Splice after being told about the change he accepted the changed

25   terms of his employment.  *Id*. (citing *DiGiacinto v. Ameriko-Omser v. Corp.*, 59 Cal. App. 4th

26   629, 637 (1997)).

27

28

## III.    ANALYSIS

### A.  Legal Standard under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial."  *Id.*  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 252 (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.

### B.  Claim One (Retaliation)

#### 1.  Legal Standard

In evaluating retaliation claims under Title VII and FEHA, courts consider the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Miller v. Fairchild Indus., Inc*., 885 F.2d 498, 504 n. 4 (9th Cir.1989); *see also Flait v. North Am. Watch Corp*., 3 Cal.App.4th 467, 475–476 (1992).  Under that framework, "(1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive." *Morgan v. Regents of University of Cal*., 88 Cal.App.4th 52, 68 (2000) (quoting *Clark v. Claremont University Center*, 6 Cal.App.4th 639, 662 (1992)).

To make a prima facie case of retaliation, a plaintiff must demonstrate that: 1) he engaged in a protected activity; 2) he suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision. *Yanowitz v. L'Oreal USA, Inc*. 36 Cal. 4th 1028, 1042 (2005) (citations omitted).  In *Morgan v. Regents of University*

United States District Court
Northern District of California

*of Cal.*, the court explained that an employer's retaliatory motive may be established not only by direct evidence but also by circumstantial evidence.  88 Cal.App. 4th at 68.  Thus, the "employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision" may give rise to an inference sufficient to establish a causal link.  *Id.* (citations and quotations omitted).

"It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA." *Yanowitz*, 36 Cal. 4th at 1043.  The court in *Yanowitz* explained the "strong policy considerations" that support this rule:

> Employees often are legally unsophisticated and will not be in a position to make an informed judgment as to whether a particular practice or conduct actually violates the governing antidiscrimination statute. A rule that permits an employer to retaliate against an employee with impunity whenever the employee's reasonable belief turns out to be incorrect would significantly deter employees from opposing conduct they believe to be discriminatory.

*Id.* Thus, while a mistaken belief that an employer's conduct is discriminatory must be held in "good faith" and must be reasonable, that is, not "utterly baseless," the plaintiff is not required to demonstrate that the employer *actually* engaged in discrimination to make a prima facie case of retaliation.  *Id.*

Once a plaintiff successfully establishes a prima facie case of retaliation, the burden of production shifts to the employer to present a legitimate, nonretaliatory reason for undertaking the adverse employment actions.  *Morgan*, 88 Cal. App. 4th at 69.  "If the employer produces substantial evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination created by the prima facie case simply drops out of the picture and the burden shifts back to the employee to prove intentional discrimination."  *Id.* (citations and quotations omitted).

A plaintiff is "required to produce 'very little' direct evidence of the employer's discriminatory intent to move past summary judgment." *Id.* (quoting *Chuang v. University of California Davis*, 225 F.3d 1115, 1128 (9th Cir. 2000)).  On the other hand, where a plaintiff seeks

26

to demonstrate that the non-discriminatory reason articulated by the employer is pretext based on circumstantial evidence, a plaintiff must offer "specific" and "substantial" evidence to survive summary judgment on a retaliation claim under FEHA. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). Either way, a "plaintiff in a discrimination case need not necessarily produce additional evidence of discrimination in the third stage of the *McDonnell Douglas* inquiry" so long as the Plaintiff has produced "sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision." *Morgan*, 88 Cal. App. 4th at 69, n. 10 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 140 (2000)).

### 2.  Discussion

To survive summary judgment as to his retaliation claim, Munson must demonstrate that there are material issues of fact as to his prima facie case; to the extent Defendants have offered evidence that Munson was terminated for a legitimate reason unrelated to any protected activity, Munson must also offer evidence sufficient to create a material dispute of fact that Defendants' reason was pretextual. The Court finds that Plaintiff has met both requirements and therefore his retaliation claim is not suitable for determination on summary judgment.

#### a.  Prima Facie Case

It is undisputed that Munson complained to Splice officers Coan and Bischoff, as well as to the Splice HR manager, that he believed Splice's efforts to terminate Robinson were based on race. It is also undisputed that Munson was subsequently terminated.   Thus, the remaining questions are whether: 1) there is evidence that Munson had a reasonable, good faith belief that Splice's conduct was motivated by race; and 2) there was a causal nexus between Munson's complaints and his termination.

As to the causal nexus, the close proximity in time between Munson's complaints and his termination is sufficient to give rise to a fact question as to this element of his prima facie case. *See Morgan*, 88 Cal. App. 4th at 68. Plaintiff has also offered sufficient evidence to demonstrate a genuine dispute of fact as to whether he had a reasonable, good faith belief that Splice sought to terminate Robinson due to his race. This includes evidence that Munson knew that Robinson was

27

the only African American member of the sales team and also was the only sales team member who was removed from the lead rotation, allegedly based on poor performance, even though the non-African American members of the team who had failed to meet their targets were not deprived of sales leads.  It also includes  Munson's own testimony that Bischoff allegedly acknowledged Robinson's qualifications at the time he was hired but nonetheless questioned whether he was a "good fit" for Splice from the outset without offering any specific reasons for his opinion;  similarly, Munson offers testimony that Bischoff singled Robinson out for minor criticisms that he did not offer to the rest of the team (who were not African American), and that when Bischoff instructed Munson to fire Robinson, he did not offer any specific response to Munson's opinion that Robinson should not be  terminated because he was one of Munson's best performers and a valuable member of the team.[9]

Defendants mischaracterize the evidence when they assert that there is no evidence Munson had a reasonable belief Defendants were motivated by Robinson's race when they asked Munson to terminate Robinson.  Munson's deposition testimony that he had never heard any Splice employees make *overtly* racial comments about Robinson and that he believed Defendants were motivated by race based on "feeling and speculation" are, at most, admissions that Munson cannot provide *direct* evidence of discrimination.  Munson does not however, "admit that there is absolutely no evidence that Robinson was discriminated against," as Defendants contend.  Nor have Defendants have offered any authority suggesting that a plaintiff in a retaliation case can only have a reasonable belief that the employer's conduct is discriminatory where there is direct evidence of discriminatory intent.  To the contrary, it is well-established that discriminatory intent may be inferred based on circumstantial evidence, as discussed above.

  b.  Pretext

Defendants have offered evidence that Splice terminated Munson for poor performance, citing the evaluation completed by Bischoff in mid-September listing numerous areas of concern

---

[9] The Court does not rely on the statement in Munson's declaration that the HR manager, Scott Orvis, said that he agreed that Munson was being terminated because he refused to fire Robinson. Therefore, the Court declines to rule on Defendants' Evidentiary Objection No.11 and does not rule on whether this statement may be admissible as a party admission.

United States District Court
Northern District of California

1    with respect to Munson's job performance.  As this is a legitimate, non-discriminatory reason for

2    terminating Munson, the burden shifts to Plaintiff to show that there is a fact question as to

3    whether the reason offered by Defendants is  pretextual.  Plaintiff has met that burden.

4           First, Munson offers testimony which arguably constitutes direct evidence of

5    discriminatory intent.  In particular, Munson states that in the last conversation between Bischoff

6    and himself that Bischoff became angry when Munson suggested Robinson's race was a factor

7    and, instead of denying that he wanted to terminate Robinson based on race, stated that he could

8    get rid of anyone he wanted for "any reason" he wanted.  If the jury credited this testimony, it

9    could construe this statement as an admission by Bischoff that he wanted to terminate Robinson

10   because of his race.  Even if Munson's testimony about the conversation with Bischoff is not

11   direct evidence of discriminatory intent, Plaintiff has offered specific and substantial

12   circumstantial evidence of pretext.  This includes Bischoff's statements in Plaintiff's evaluation,

13   dated September 15, 2011, that notwithstanding the areas Munson needed to address with respect

14   to his performance, Bischoff was "committed to Dennis' success" and that he was "convinced that

15   Dennis can be extremely successful."  When considered in light of the evidence offered by

16   Munson that his only subsequent conversation with Bischoff before Munson's termination was the

17   one when Munson allegedly complained that Splice wanted to terminate Robinson based on race,

18   a jury could reasonably conclude that the significant change in Splice's attitude toward Munson is

19   evidence of pretext.

20          The Court also finds that the declaration by Robinson is specific and substantial evidence

21   from which a jury could conclude that Defendants terminated Munson as retaliation and not due to

22   his poor performance.  In particular, to the extent Robinson testified that he was told that if he did

23   not resign from his position at Splice he would be terminated –regardless of whether he met his

24   sales targets – a jury might reasonably conclude that the reason Splice now offers for terminating

25   Robinson is pretextual and draw a further inference that Splice's assertion that it fired Munson for

26   the same reason is likewise untrue.

27          Accordingly, the Court finds that there are material issues of fact that preclude summary

28   judgment on Plaintiff's retaliation claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

C.   **Claim Two (Breach of Agreement)**

1.   **Legal Standard**

To prevail on a claim for breach of contract, a plaintiff must prove the following elements: 1) existence of the contract; 2) plaintiff's performance or excuse for nonperformance; 3) defendant's breach; and 4) damages to plaintiff as a result of the breach.  *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*,116 Cal. App. 4th 1375, 1391 n. 6 (2004)(citation and quotation omitted).

A contract may be express or implied.  Cal. Civ. Code § 1619.  While communications of an employer to an employee or prospective employee may, under some circumstances, give rise to an implied contract, "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results." *Starzynski v. Capital Public Radio, Inc.*, 88 Cal.App.4th 33, 38 (2001) (citing *Camp v. Jeffer, Mangels, Butler & Marmaro,* 35 Cal.App.4th 620, 630 (1995)).  Thus, "an at-will provision in an express written agreement, signed by the employee, cannot be overcome by proof of an implied contrary understanding."  *Id.* (quoting *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 340, n. 10 (2000));  *see also* Cal. Code Civ. Proc. § 1856(a).

Further, the extrinsic evidence that may be considered to determine the scope and meaning of a contractual agreement is limited by the parol evidence rule, codified in California Civil Code § 1856.[10]  Under that rule, "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."  Cal. Civ. Code § 1856(a).   However, such terms "may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement." Cal. Civ. Code § 1856(b).

"[T]he extent to which a writing constitutes the parties' final expression of their

---

[10] The rule that an implied contract term may not be displaced by an express contract term is a separate doctrine from the parol evidence rule.  3 Witkin, Summary of California Law, 10th Ed. (2005) § 234 at p. 297.

United States District Court
Northern District of California

1    agreement" is referred to in contract law as "integration." *Esbensen v. Userware Internat., Inc.*,

2    11 Cal.App.4th 631, 636 (1992).  "[W]here following negotiations the parties execute a written

3    agreement, that agreement is at least 'partially' integrated and parol evidence cannot be admitted

4    to contradict the terms agreed to in the writing." *Id*.  If a contract is only partially integrated,

5    however, "[e]vidence of related oral understandings . . .  is admissible to prove additional terms of

6    the contract not inconsistent with the express language of the writing." *Id*. (citations omitted).

7    Alternatively, a written contract may be "fully integrated" where it is found that the parties

8    intended it to be the "complete and exclusive statement of the terms of the agreement." *Id*. (citing

9    Cal. Civ. Code § 1856(b)).  In that case, "parol evidence is inadmissible even to add terms not

10   inconsistent with the writing." *Id*.

11         The determination of whether the agreement in question is partially or fully integrated is a

12   question of law to be determined by the court.  *Id*. (citing Cal. Code Civ. Proc. § 1856(d)).

13         **2.  Discussion**

14         As a preliminary matter, the Court notes that Defendants have *not* asserted that the offer

15   letter was intended to express the complete and exclusive agreement between the parties as to the

16   terms of Munson's agreement with Splice, that is, that the offer letter was a fully integrated

17   agreement that precludes the introduction of evidence to demonstrate the existence of collateral

18   agreements not inconsistent with the terms of the offer letter.[11]  Nor have Defendants pointed to

19   any evidence that the parties intended that the offer letter would constitute the complete and

20   exclusive statement of the terms of the agreement.   Further, the offer letter does not contain an

21   express integration clause.  *See Wallis v. Farmers Group, Inc*.,  220 Cal.App.3d 718, 730 (1990)

22   (holding that the absence of an integration clause may show that the parties did not intend for the

23   writing to be integrated).  Therefore, the Court finds that the offer letter is partially integrated, that

24   is, that the parties intended the terms of the offer letter to express their final agreement as to those

25   terms, but that the offer letter is not a fully integrated agreement that precludes the introduction of

26   collateral oral promises that are not inconsistent with the terms of the offer letter.

27

28   [11] Plaintiff raised this issue in his brief, asserting that "the offer letter specified certain terms of the
     employment relationship, but not the entire understanding."  Opposition at 12.

United States District Court
Northern District of California

1    The Court also notes that Munson does not dispute that he is barred from pursuing his

2    breach of agreement claim based on his termination and in fact, clarifies in his Opposition brief

3    that his contract claims are based on his alleged failure to get the benefit of his bargain with Splice

4    "as long as [he] remained an employee of Splice."  Opposition at 12;  *see also id.* at 14 ("Plaintiff

5    did not and does not contend that his termination, in and of itself, constituted a breach of

6    contract").  In other words, he concedes that Splice's alleged verbal assurances about the terms

7    and conditions of his employment do not limit the scope of the at-will provision in the offer letter.

8    With these caveats, the Court addresses the five theories upon which Munson bases his

9    breach of agreement claim, which the Court finds fall into two general categories:  promises

10   relating to the terms of Munson's employment (being permitted to hire a sales engineer, control

11   inside sales and work remotely from Michigan) and compensation (the issuance of Splice stock

12   shares and Munson's salary).  For the reasons stated below, the Court finds that Plaintiff has failed

13   to establish a material issue of fact as to all of these theories.

14            a.   Conditions of Employment

15                 i.    Hiring of Sales Engineer

16   Plaintiff provides evidence, in the form of his own declaration and the offer letter,

17   sufficient to create a genuine dispute of material fact as to the existence of a contractual obligation

18   to hire a sales engineer within two months.  In particular, Munson states he was provided express

19   assurances in two specific conversations with Bischoff prior to accepting Splice's employment

20   offer that he would be allowed to hire a sales engineer "quickly."  Munson Decl., ¶ 13.  This

21   evidence may be considered under the parol evidence rule because it does not conflict with the

22   terms of the offer letter, which explicitly references the hiring of a sales engineer in Month 2 as a

23   Measured Business Objective for the purposes of determining Plaintiff's compensation.

24   Plaintiff has also offered evidence sufficient to demonstrate a fact question as to whether

25   this obligation was breached, stating in his declaration that Bischoff rejected approximately 25

26   qualified candidates Munson passed on to Bischoff for review and that Bischoff did not agree to

27   hire a sales engineer for approximately six months after Munson was hired.  *Id.*, ¶¶ 16-18.

28   Because the alleged promise was to hire a sales engineer within two months, this evidence is

1    sufficient to demonstrate a material issue of fact as to breach of the promise even though it is

2    undisputed that Splice eventually hired a sales engineer.

3            Plaintiff has not, however, pointed to evidence sufficient to demonstrate a material issue of

4    fact as to resulting damages.  Munson states in his declaration that because he was not permitted to

5    hire a sales engineer promptly, he lost "a number of sales" and members of his sales team were

6    hampered in their ability to meet their sales quotas.  *Id*., ¶ 19.  His statement is entirely conclusory

7    however.  Further, he does not offer any evidence from which a jury could conclude that the

8    alleged loss in sales resulted in a reduction in Munson's own compensation;  to the contrary,

9    Munson concedes that he was paid the salary bonus associated with the hiring of a sales engineer

10   for Month 2.  Thus, Munson's breach of agreement claim fails on summary judgment to the extent

11   it is based on Defendants' alleged failure to hire a sales engineer.

12                   ii.    Working Remotely

13           Munson also provides evidence sufficient to create a fact question as to the existence of an

14   agreement that he would be permitted to work remotely from Michigan after a "reasonable period

15   of time"  working at Splice, which was understood to be at least the first six months of his

16   employment.  *Id*., ¶ 5.[12]  This agreement, like the alleged promise that Plaintiff would be

17   permitted to hire a sales engineer, is not inconsistent with the offer letter, which is silent as to

18   whether Plaintiff would be permitted to work remotely, and therefore may be considered by the

19   Court without running afoul of the parol evidence rule.   Munson offers no evidence, however,

20

21   _____

22   [12] The Court notes that Munson cites allegations in his complaint and his own responses to
     Defendants' contention interrogatories in his Opposition brief in order to demonstrate that his
23   claim should survive.  See Opposition at 14.  The statements in Munson's interrogatory responses
     are inconsistent with statement in his declaration to the extent that he stated in his responses that
24   he was promised he could work remotely from Michigan 20% of the time, even during the first six
     months of his employment with Splice.  *See* Askanas Decl., Ex. C at 9.  As Plaintiff's
25   interrogatory responses are not sworn under penalty of perjury they are not sufficient to create a
     fact question on summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Nor
26   are the allegations in Plaintiff's complaint sufficient to demonstrate the existence of a dispute of
     material fact. Therefore, the Court rejects Munson's reliance on the statements in his interrogatory
27   responses and in his complaint to establish a fact question.  *See* Opposition at 14.  The Court
     further notes that even if it were to treat the interrogatory responses as admissible evidence it
28   would reach the same result because Plaintiff has not introduced any evidence of harm, as
     discussed further below.

United States District Court
Northern District of California

1    establishing a breach of that promise.[13]   Nor does he offer any evidence that he was harmed by any

2    alleged breach.   Indeed, he was terminated only a few days after the initial six-month period

3    expired.   Therefore, Defendants are entitled to summary judgment on Plaintiff's breach of

4    agreement claim to the extent it is based on any promises to allow him to work remotely.

5                             iii.    Control of Inside Sales Team

6                Plaintiff alleges he was promised before coming to Splice that he would have "meaningful

7    and effective responsibility for managing all sales personnel and functions within Splice

8    Communications including inside sales" and that he would have "complete control of the

9    company's inside sales team."   Complaint, ¶ 14.   The evidence as to whether such a promise was

10   made is sufficient to give rise to a material dispute of fact.   Munson states in his declaration that

11   "[p]rior to being hired, [he] negotiated for and received the promise that [he] would have control

12   of [his] sales team."   Munson Decl., ¶ 24. Although the phrasing of the declaration is ambiguous

13   to the extent that it is not entirely clear whether Munson is referring to the inside sales team, the

14   outside sales team, or both, Munson's deposition testimony supports the conclusion that he

15   believed he would be in charge of both sales teams.   *See* Second Supp. Askanas Decl., Ex. A

16   (Munson Depo.) at 147-148.   Further, Munson's testimony is not inconsistent with the language of

17   the offer letter.[14]

18                There is also evidence that Splice breached its agreement with Munson that he would

19   control the inside as well as the outside sales team.   In particular, Munson testified that he was not

20

21   [13] Although Munson states in his interrogatory responses that he was told that he was being
     terminated in part because he spent too much time working remotely, there is no such statement in
22   Munson's Declaration.  In any event, for the reasons discussed above, Plaintiff's claim is not
     actionable to the extent it is based on his termination because of the express at-will provision in
23   his offer letter.
     [14] Defendants contend this theory fails because Munson concedes that he was told in his first week
24   at Splice that he would *not* be in charge of the inside sales team, at least for some period of time.
     *See* Defendants' Supp. Brief at 6 (citing *DiGiacinto v. Ameriko-Omser v. Corp.*, 59 Cal. App. 4th
25   629, 637 (1997)).  According to Defendants, by continuing to work at Splice, Munson accepted
     the changed terms of employment and therefore cannot bring a breach of agreement claim based
26   on the earlier promise.  Defendants' reliance on *DiGiacinto* in support of this argument is
     misplaced, however, because in that case the change in the employment agreement was made in
27   writing whereas here there is no evidence that Munson received written notice of the change.  As
     the offer letter expressly states that modifications must be made in writing by the COO, *see*
28   Bischoff Decl., Ex. C at SC 0024, the Court rejects Defendants' assertion that Munson accepted
     the changed terms of his employment agreement as to control over the inside sales team.

United States District Court
Northern District of California

1    permitted to control the inside sales team and that Carol Kamura retained control of that team for

2    the entire time he worked at Splice.  *Id*. Again, however, there is no evidence from which a jury

3    could reasonably conclude that Munson suffered harm because inside sales were controlled by Ms.

4    Kamura rather than Munson.  In fact, there is no evidence at all that Munson suffered any damages

5    as a result of the fact that he did not control inside sales.  Therefore, Defendants are entitled to

6    summary judgment on Munson's breach of agreement claim to the extent it is based on an alleged

7    promise to allow Munson to control the inside sales team.

8                     b.  Compensation

9                          i.   Salary

10         In his brief, Plaintiff argues that his breach of agreement claim based on the amount of

11   compensation he would receive at Splice is based on *oral* representations that he would be paid

12   between $300,000 and $400,000 and not on the offer letter or a March 7, 2011 email cited by

13   Defendants.[15]   Opposition at 15.  On that basis, he argues that his breach of agreement claim

14   survives to the extent it is based on this promise.  The Court disagrees.

15         First, the only evidence in the record on this issue is a single statement in Munson's

16   declaration that Bischoff told Munson he could "expect to receive between $300,00 [sic] and

17   $400,000.00 in this position based on [his] compensation plan."  Munson Decl., ¶ 15.  To the

18   extent this statement references the compensation plan, which is set forth in the offer letter and

19   makes clear that only the base salary is guaranteed, no reasonable jury could conclude that this

20   assurance gave rise to a contractual obligation requiring Splice to pay Munson this amount in

21   salary regardless of the terms of the compensation plan, as Munson seems to suggest.

22         Second, to the extent Plaintiff offers this evidence to establish that Splice guaranteed this

23   amount in salary, the Court may not consider this evidence because the alleged promise that

24   Munson would be paid between $300,000 and $400,000 is inconsistent with the very specific

25   terms of the offer letter regarding the terms of Plaintiff's compensation, which guaranteed only a

26

27   _____

28   [15] In that email, Bischoff stated:  "I actually believe with the term bonus and account retention bonus . . . plus the accelerators for over target performance, this position would pay in the 300-400k range, annually for the right manager."  Askanas Decl., Ex. B at 13.

United States District Court
Northern District of California

base salary of $125,000.  The offer letter also made clear that any additional compensation would be based on the performance measures set forth in the offer letter and therefore was *not* guaranteed.  Thus, evidence that Defendants made verbal promise to Munson that he would be paid $300,000 to $400,000 may not be considered under the parol evidence rule.

Therefore, Defendants are entitled to summary judgment on the breach of agreement claim to the extent it is based on alleged oral promises to Plaintiff that he would receive a salary of between $300,000 and $400,000.

### ii.   Stock Shares

Plaintiff also bases his breach of agreement claim on oral promises allegedly made by Bischoff during Munson's job interview that Munson would be given 10,000 shares of Splice stock.  Munson Decl., ¶ 15.   According to Munson's brief, this oral promise amounted to a promise that the shares were not subject to vesting over time.  Opposition at 3.  Munson offers no evidence, however, that the parties ever discussed this issue.  Therefore, the Court concludes that a reasonable jury could not find, based on this evidence, that Defendants promised that Munson's stock shares would vest immediately.  Further, under Munson's interpretation of Bischoff's oral promises, this evidence is inconsistent with the express terms of the offer letter, which states that the shares *are* subject vesting, as a rate of 25% per year.  Therefore, under the parol evidence rule, the Court may not consider the evidence offered by Plaintiff in support of this claim.

For these reasons, Defendants are entitled to summary judgment as to Plaintiff's breach of agreement claim to the extent it is based on an alleged promise that Plaintiff  would receive 10,000 Splice shares that were not subject to vesting when he accepted the job with Splice.

### c.   Conclusion

For the reasons stated above, the Court finds that Defendants are entitled to summary judgment on Plaintiff's breach of agreement claim, in its entirety.

### D.  Claim Three (Breach of Implied Covenant of Good Faith and Fair Dealing)

The elements of a claim for breach of the implied covenant of good faith and fair dealing are as follows:  "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from

having to do; (3) all conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff." *Woods v. Google, Inc.*, 889 F.Supp.2d 1182, 1194 (N.D. Cal., 2012).

The California Supreme Court has explained that "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 350 (2000) (citations omitted).  It "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id*.  Thus, for example, an at-will employee cannot bring a claim for breach of the implied covenant based on termination without good cause because such a claim would impose duties on the employer that do not exist under the contract. *Id*.

Finally, although a breach of contract may also constitute a breach of the implied covenant of good faith and fair dealing, where the latter claim merely realleges  the former, it is subject to dismissal on the basis that it is superfluous. *Id*. at 352.

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is based on Splice's alleged failure to permit him to manage his own sales team or hire a sales engineer. Opposition at 15.  For the reasons discussed above, however, the Court finds that there is no evidence of damages flowing from either of these alleged breaches of the implied covenant of good faith and fair dealing.  Accordingly, Defendants are entitled to summary judgment on this claim.

**E.   Claims Four, Five and Six (Cal. Labor Code § 970, Fraud & Deceit, Negligent Misrepresentation)**

In the Motion, Defendants argue that Claims Four, Five and Six fail, as a matter of law, because "there is no evidence that Defendants made any false representations about Splice's Vice President of Sales position to Plaintiff."  Motion at 18.  Plaintiff bases these claims on the same five alleged promises discussed above, namely, those relating to: 1) salary level; 2) Splice stock shares; 3) ability to work remotely; 4) hiring of sales engineer; and 5) control of inside sales team.

United States District Court
Northern District of California

1  *See* Askanas Decl., Ex. C (Interrogatory Responses) at 15-17.   For the reasons discussed above,

2  the Court finds that Plaintiff fails to offer sufficient evidence to demonstrate a material dispute of

3  fact as to whether Defendants promised that he would receive $300,000 to $400,000 in

4  compensation or 10,000 stock shares that would vest immediately.   Therefore, Claims Four, Five

5  and Six fail to the extent they are based on those alleged misrepresentations as well.   Below, the

6  Court addresses Claims Four, Five and Six individually with respect to the remaining

7  representations that are the subject of these claims, that is, the alleged promises that Munson

8  would be permitted to work remotely after his first six months at Splice, would control the inside

9  sales team and would be allowed to hire a sales engineer by the second month at Splice.

10        **1.   Cal. Labor Code § 970**

11  California Labor Code § 970 provides, in relevant part, as follows:

12  No person, or agent or officer thereof, directly or indirectly, shall influence,
persuade, or engage any person to change from one place to another in this
13  State or from any place outside to any place within the State, or from any
place within the State to any place outside, for the purpose of working in
14  any branch of labor, through or by means of knowingly false
representations, whether spoken, written, or advertised in printed form,
15  concerning either:

16  (a) The kind, character, or existence of such work;

17  (b) The length of time such work will last, or the compensation therefor[.]

18  . . .

19  Cal. Labor Code § 970.  As discussed above, there is sufficient evidence in the record to create a

20  material issue of fact as to whether Splice told Plaintiff he could work remotely after the first six

21  months, that he could control the inside sales team and that he would be permitted to hire a sales

22  engineer.  Further, Plaintiff states in his declaration that he would not have accepted Splice's offer

23  if he had not received these assurances, from which a jury could reasonably conclude he was

24  influenced by these promises in deciding to accept Defendants' offer.  Nonetheless, the Court

25  finds Defendants are entitled to summary judgment because the evidence in the record is not

26  sufficient to demonstrate Defendants' representations caused Plaintiff to "change from one place

27  to another" within the meaning of the statute.

28        In *Stevens v. v. Thomas Keller Restaurant Group*,  2009 WL 3841879 (N.D.Cal., Nov. 17,

38

2009) (Chen, J.), the court addressed the meaning of the words "change from one place to another," which it found to be ambiguous.  Noting that there is little legislative history available, the court looked to California cases that have addressed the purposes of the provision.  *Id*. at *3 (citing *Seubert v. McKesson Corporation*, 223 Cal.App. 3d 1514 (1990) and *Mercuro v. Superior Court*, 96 Cal.App.4th 167 (2002)). Based on these cases, the court found that § 970 has two purposes: 1) to protect the employee from unscrupulous employers who might make false promises to induce the employee to move;  and 2) to protect the community "from the harm inflicted when a fraudulently induced employment ceases and the former employee is left in the community without roots or resources and becomes a charge on the community."  *Id*. at *3-4.  The court further found that § 970 "is particularly targeted to employees who have in fact changed residence (and thus incurred the full scope of reliance costs unlike those who only contemplate or begin the process of moving)."  *Id*. at *3.  The court concluded that a "change from one place to another" requires that a plaintiff must have actually physically relocated and that it is not enough to have "taken steps" to relocate.  *Id*.;  *see also Asnaashari v. PNY Technologies, Inc.*,  2013 WL 2403605, at *2 (N.D.Cal., May 31, 2013) (Hamilton, J.) ("even if for a short duration, section 970 still requires a relocation of residence, and not merely a site visit").  The undersigned finds the reasoning in *Stevens* to be persuasive.

Here, the undisputed evidence is that Plaintiff took an initial step towards relocating to California in taking out a six-month lease on an apartment in California.  However, Plaintiff concedes that he never gave up his residence in Michigan, where he continues to live**.**  Under such circumstances, the potential burden on the local community against which § 970 is designed to protect does not come into play.  Nor is the burden on the employee as severe where he or she has continued to maintain a residence elsewhere.  While the Court has found no California case law that directly addresses the question, it concludes based on the purposes of § 970, as set forth in *Stevens*, that that provision was not intended to extend to situations in which an employee works in California for a period of time while still maintaining his or her out-of-state residence.

Nor does the *Collins* decision support a contrary result.  *See* 7 Cal. 3 232 (1972).   There, the court held that a change in residence under § 970 does not require a permanent relocation of

residence. *Id*. at 239-240.  Thus, allegations by a group of migrant workers that they were fraudulently induced to travel 400 miles from Los Angeles to Monterey County for a job that was to last only two weeks (with housing provided) were found sufficient to state a claim under § 970. *Id*.  The Court in *Collins* did not address, however, whether an individual who is induced to work in a location in California while continuing to maintain his or her original residence makes a change that is actionable under § 970.  For the reasons discussed above, the Court concludes that such an employee  cannot assert a claim under § 970.

### 2.  Fraud & Deceit

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) (quoting Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778).

As discussed above, Plaintiff has offered sufficient evidence to create fact questions as to whether Defendants misrepresented to him that he would 1) control the inside sales team, 2) be permitted to hire a sales engineer within two months and 3) be permitted to work remotely.  He also offered evidence that he accepted Splice's job offer based, in part on these assurances.  However, as discussed above, Plaintiff has not offered any evidence from which a jury reasonably could conclude that he was harmed by his reliance on the first two representations. Nor has he offered evidence that Defendants breached their promise as to the third representation.  Therefore, Defendants are entitled to summary judgment on this claim.

### 3.  Negligent Misrepresentation

"The same elements comprise a cause of action for negligent misrepresentation, except there is no requirement of intent to induce reliance." *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004).  Accordingly, the Court reaches the same result as to the Negligent Misrepresentation claim as it reaches on the Fraud & Deceit claim, that is, that Defendants are entitled to summary judgment on this claim.

United States District Court
Northern District of California

**F.   Request for Punitive Damages**

Defendants ask the Court to grant summary judgment on Plaintiff's request for punitive damages on Claim One (Retaliation), Five (Fraud & Deceit) and Six (Negligent Misrepresentation) based on the conclusory assertion that "the undisputed facts preclude a finding by clear and convincing evidence that Defendants acted with malice, oppression or conscious disregard of Plaintiff" because "at all times acted consistent with its obligations under Plaintiff's offer letter . . . [and] the uncontroverted evidence establishes Plaintiff was terminated due to poor performance."   Motion at 21.  Because the Court finds that Defendants are entitled to summary judgment as to Claims Five and Six, their request is moot as to those claims. As to Claim One, the Court finds that there are fact questions as to Defendants' motives for terminating Munson for the same reasons there are fact questions on the underlying claim for retaliation.  Therefore, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's request for punitive damages on Claim One.

**IV.   CONCLUSION**

For the reasons stated above, the Court DENIES the Motion as to Claim One, for Retaliation under FEHA.  The Court GRANTS the Motion as to all of the remaining claims, which are dismissed with prejudice.  The Court DENIES Defendants' request for summary judgment as to punitive damages to the extent that request relates to the remaining claim in the case.

**IT IS SO ORDERED.**

Dated: December 16, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge